Mr. Sweeney, whenever you're ready. I didn't want to appear too overeager this morning, Chief Judge. May it please the Court, I am John Parker Sweeney, and I am privileged to be representing Steve Kolbe, Andrew Turner, and other law-abiding citizens groups in the state of Maryland. We are here appealing from the District Court's decision upholding Maryland's ban on a class of firearms the state calls assault long guns, including the most popular semi-automatic rifles, as well as on detachable magazines so common they are standard. This case is closer to the facts of Heller than any other case that has come before this Court, and Heller's first principles are most directly applied here. To reach one conclusion, Maryland's bans impermissibly restrict plaintiffs' fundamental core right under the Second Amendment. Plaintiffs respectfully request this Court overturn these bans because Heller dictates a statute banning protected arms from the home must fail constitutional review. Alternatively, this Court should apply its two-part approach to require strict scrutiny, as did the panel majority here. The Supreme Court's Second Amendment jurisprudence is straightforward. The government cannot ban protected arms from the homes of law-abiding citizens. The Heller Court clearly staked out the core right, the who, the where, and the what, that lies at the heart of the Second Amendment, holding that the Second Amendment surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home. The Court emphasized the where, the special importance of the home, where the need for defense of self, family, and property is most secure. Suppose the legislature were to come to the conclusion that the particular weapons that are subject to the ban are not primarily used for self-defense in the home, but are used for offensive rather than defensive purposes. Can a state legislature arrive at that conclusion constitutionally? The test under the Second Amendment is whether arms are kept in the home for lawful purposes by law-abiding citizens. You're not answering my question. I'm saying... The answer to your question, sir, is no. The government cannot ban arms that are typically kept by law-abiding citizens for lawful purposes. So it could not ban any arms because it's conceivable that somewhere the arms are kept in the home for law-abiding purposes, so that there's no class of arms that a state legislature could constitutionally prohibit. Conceivability is not the test, Your Honor. The test is in common use. Typicality... If machine guns... Oh, here. If machine guns had not been banned, and machine guns were in the same use as AR-15s, could they be banned under your view today? Machine guns... Would that be yes or no? The answer is they could not be banned if they are in common use today. My hypothetical said the same use as AR-15s today. They could not be. The same would apply to sawed-off shotguns. The same would apply to sawed-off shotguns. How about howitzers? You could park one in your garage. If they are as popular as these firearms are, yes. And let me explain why that's the case. What do you mean by popular? What's your definition of popular? Let's go back to what the National Firearms Act did in the 1930s, which was interpreted in Miller and again in Heller to determine what arms... What do you mean by popular? Yes. Popular is whether or not they are in common use that has a numerosity component... Is that nationwide or is that, how about, state-of-Maryland-wide? That would be either. That would be either. In the District of Columbia, there had long been a ban on handguns. They could not be in popular use in the District of Columbia. This case doesn't have anything to do with handguns. My point is that the D.C. ban applied to handguns for many, many years. They could not have been popularly used in D.C. if it was the test of how popular they are in only that jurisdiction. Why is the state legislature the best gauge of popularity? I mean, after all, popularity derives from the people, and the state legislature is a representative of the people, and presumably the state legislature is in a good position to know which weapons are popularly used for self-defense in the home and which are not. But why should the courts be the sole judge of popular use? The courts are not the sole judge. They're the final judge, and that's the difference. Yes, legislatures have a very important role in this, and yes, they have the opportunity to put their imprimatur on the law. And when it comes before this court, this court is going to be the final arbiter of that. The legislature is not the final word on the subject. That's the role of this court. Could you go back to what you were about to say about Heller? Were you going to say since handguns did not meet any numerosity requirement in Heller that it can't be that? It can't be that. It's a typicality of use. So let me ask this. Typicality of use where if the guns aren't in the District of Columbia? Typicality of use across the nation. And so if handguns had been banned across the nation, then your argument would fail? It would depend upon whether handguns had ever been typically used for lawful purposes. And the National Firearms Act focused on machine guns and it focused on sawed-off shotguns. They were not restricted prior to that time. If handguns had been restricted in the same bill, then you'd have no constitutional right to have a handgun under the OVA? No. The reason machine guns are not typically used for lawful purposes is they've never been typically used. What about the M-16 mentioned in the Heller case? It's specifically mentioned as one that can be banned. There is the Second Amendment protected. The M-16 is a machine gun. M-16 and the like. And the like. The language of Heller, M-16 and the like. What does the like include? The like includes other automatic firearms. So automatic is written in there. You'd write automatic in there. So a semi-automatic such as the AR-15 is not included. So that's where you'd draw the line. Absolutely. Between the M-16 that's automatic and the AR-15 that's semi-automatic. Yes, and that's the bright line. And that language is not in Heller. That's the bright line that was drawn in the Staples Court. In the Staples Court. The Staples Court called the AR-15 the civilian version of the M-16. And it also calls it. And the Heller Court referred to the M-16 and the like. Yes. And the like. That's the like. Other automatic. That's what's in there. It says M-16 and the like. You add the automatic and maybe you're right. But the language of the opinion doesn't contain it. It is a bigger leap to say that and the like means the civilian version of the M-16 than it is to say other automatic firearms that are classified as machine guns and have been regulated under the National Firearms Act. I want to take you back to your theory again as you were espousing under Heller. Is your theory then based on the constitutional right to have any particular gun is based on how early that gun gets banned? No. Not at all. Why isn't it? Let me explain my question and you can answer. Because I asked about handguns. You said, no, they had been in use. Well, what if the time the first handgun that was introduced, Thomas banned it the next day? Every new weapon that was invented, it was banned the next day. Then it wouldn't meet your requirements to be constitutional, would it? That is not this case. The answer to your question is I don't know. That was not addressed by the Heller court. Well, I'm asking you because you are going to start to understand your theory. Because I'm trying to figure out my theory. My theory does not rest on whether or not a new technology that emerges and is banned before it can be used at all by any civilian is going to pass this test. But we do have some guidance, if I may, Judge Shedding, from the Caetano case. The Caetano case recently decided by the Supreme Court per curiam, all eight judges summarily reversing the state of Massachusetts, upholding its ban on stun guns. Could I ask you a converse of the questions you've been answering with respect to the common use? Suppose that a gun maker, perhaps some of your clients are gun makers in this court. Some of my clients represent gun makers, Your Honor. Okay, so one of your clients, one of the people that you represent, invented a brand new weapon that was cheap and effective and deadly. And because it was so cheap, the gun maker decided to flood the markets with it. So it was instantly common. Would that automatically get Second Amendment protection? In other words, can your client control where the Second Amendment comes from? Yes, but I submit to you in your hypothetical, Your Honor, no gun manufacturer is controlling anything. What's controlling it is the choice of law-abiding citizens. They are making those choices. But under my hypothetical, sir, law-abiding citizens are given the gun. They are given the gun to make it popular in the community. They are given this cheap gun. So automatically we have millions of guns circulating. Brand new weapon. The Supreme Court has more faith in the law-abiding citizens and their free will to choose that which is appropriate for their lawful purposes at home. Your suggestion that somehow that free will is overcome by some manufacturer flooding a market with free weapons is... I don't think this is an outlandish hypothetical at all. If you get a free sample and you use detergent, if you get a free sample of detergent in the mail, you use the detergent. I mean, maybe you don't, but perhaps whoever... And if you try it, if you try it once and it doesn't work, you throw it out and you never buy it again. But we don't know because we don't have statistics about that, do we? We don't know about a gun being used. We don't know if your statistics... Which is the test is whether or not it's kept. Kept? But how do we measure that? We measure it by the testimony, by the surveys that are in the record of this case. Yes, or how produced. We don't have a national gun registry, do we? No, we do not. But we don't know. All we would know is statistics from your client. If we look at the facts of the Caetano case, as they were elaborated on by Justice Alito in the concurrent opinion... No weapon anywhere that couldn't conceivably by somebody or some small group be taken into the home and claimed to be utilized for self-defense. And I don't understand... It seems to me that your position is so broad. And it really comes to the point of disabling state legislatures from acting within one of their core powers, which is to protect the public safety of the citizens of this country. And you speak of law-abiding citizens. And the people that inflicted the mass harnage at Aurora and Newtown and Fort Hood and Tucson were not law-abiding citizens. And some of them were using assault weapons. And what are we to tell the people of this country? Just let event after event after event happen. And there's nothing you can do about it. And there's nothing your popular representatives can ever do about it. Because we, the courts, have this little device called strict scrutiny, which you have urged upon us today. And strict scrutiny disenfranchises everybody. And it cuts state legislatures out of the picture. And it cuts Congress out of the picture. And it cuts the executive branch out of the picture. And it makes the courts the final arbiter. At the same time, it dismembers our federal system and the traditional division of powers and what resides in the state legislative body that we have always recognized. Public safety is the heart of what state legislatures are empowered to protect. And strict scrutiny says, you have no role. And I don't understand what the stopping point. And all the questions this morning have been directed at that. Is there any limiting principle? Is there any role left for popular representative bodies, particularly at the state level? The limiting principles are bright lines and they are crystal clear. They've existed with respect to what is a protected arm since as early as the National Firearms Act. And with respect to these banned rifles, the difference is whether or not it is automatic or semi-automatic. That is a bright line. And I submit to you that once you cross that line, as the state has crossed it with these bans, there is no limiting principle. And you can't draw the line anywhere else. As I understand the argument you've made so far, you're making a, you just termed it, a bright line constitutional argument. And am I correct to understand under that argument that the court's Chester test has no role to play? There is no level of scrutiny that's to be applied in the traditional sense. Our first argument is exactly that, Your Honor. It is that if these are protected arms, and every court that has looked at it has either found or assumed they are protected. If they are protected, that is the end of the court's analysis. Heller says they are banned. You cannot prohibit firearms that are protected from the homes of law-abiding citizens. Your Honor, I think it was at least a little odd that the great lengths the court went to in its discussion in Heller, including a discussion that rational basis didn't apply, that if the court intended a new rule that had no level of scrutiny, they would have said so. If the two-part approach is applied here, the result must be strict scrutiny. If this court is uncomfortable doing what the court did in Heller to summarily strike down the bans because there is no question that they ban protected arms... Counsel, the court in Heller said that under any level of scrutiny  That's my point in your argument. It's just hard to conceive that the court would, if it was announcing this broad constitutional principle, it would have said something about it instead of including level of scrutiny discussion within its opinion. Well, if we assume that the court did not intend that, then this court has already developed one of the most robust bodies of precedent under the Second Amendment in the country, applying the two-part approach. This court was one of the first to do it in Chester, but it was not the first. And that approach has been adopted by all of the circuit courts focusing on this, save only one or two. In Heller, where do you get this line between automatic and semi-automatic? What language is there in the Heller decision that embodies what... Because in trying to be faithful to Heller, we want to read the text. And where in the text of Heller can we draw the principle that you just enunciated, which is the core of which I understand to be a bright-line test between semi-automatic and automatic weapons. Now, where does that appear in Heller? Those words cannot be found per se, Your Honor, as we indicated earlier in our prior colloquy. All it says is the M16 and the like. And we know the M16 is the infantryman's weapon, right? And we know that the court has said, the Supreme Court has said, that the AR-15 is the civilian version of the M16. And we know that. And we know that one of them is automatic and one of them is semi-automatic. And you say that's the line. That's the line from Heller, but it's not in Heller. It's in Staples, not in Heller. It's in Staples. Staples was decided before Heller. If Staples was decided before Heller, this woman said it's AR-15 is the standard... AR-15 is the civilian version. That is traditionally recognized as a lawful possession. Unlike... AR-15 is one that went into the school up in Connecticut. And that's one of the triggering reasons for the adoption of this statute by the people of Maryland, which is under challenge here. But it's not in Heller. That's your answer to Judge Wilkinson's answer. That is my answer. Yes, sir. What Heller does say... Judge Wynn. If you will. I want to go back to the popularity answer you gave Judge Shedd earlier. And I think you indicated that it could be nationwide popularity or it could be maybe statewide or local popularity. And I guess my question would be then, are you saying that there are some parts of the country where it may be constitutional and other parts where it would be constitutional based upon the level of popularity that would be existing in those particular areas? No, I say we look at both, that neither would necessarily be dispositive. Well, I don't understand... In Maryland, we don't have that issue because in Maryland these firearms are as popular as they are nationwide. Right, but your answer to Judge Wynn's question, what if one part of the country was extremely popular and in another part, another state, it wasn't? Under your rationale, it would be constitutional in one place and not in another. I did not say that, Your Honor, although... Why not? Why wouldn't that follow from your argument? I'm saying you look at both. That doesn't mean either is dispositive. Heller didn't parse it. Heller did not parse it, but it could not have been focusing only on what was popular in the District of Columbia because handguns weren't available to law-abiding citizens in the District of Columbia. Can I ask you a question over here? Sorry. So does that mean, is it the opposite? The opposite is that if it's popular in one part of the country, then it's protected everywhere. So what some states... It's a one-state gun policy, right? If one state wants to promote the use of a particular weapon, make it easy to carry, allow public carry, that would affect the constitutional ability of other states to regulate it, and isn't that sort of odd? No, it's not odd at all. In the McDonald case, Judge Alito pointed out that this is one of the things that happens when you incorporate one of the Bill of Rights fundamental freedoms into the 14th Amendment. After McDonald, there was going to be plenty of room for state experimentation with gun policy. So how can it be that one state's policy decisions have this kind of constitutional ripple effect in other states? Isn't that unusual? The McDonald court said, I quote, "...incorporation of the Second Amendment right will to some extent limit the legislative freedom of the states, but this is always true when a Bill of Rights provision is incorporated." But Justice Alito was not talking about, obviously, when you make something, when you constitutionalize something, that limits the ability of any legislature to address it. But he was not talking about this point. Why should it be that one state's policy decisions have put constitutional constraints on what other states do? We're not talking about the right. We're talking about one state's policy decision to make a weapon particularly popular. So if in one part of the country, there is a policy decision by a state to promote ownership and use of a particular class of weapons, it is at least unusual. Won't you concede that that would have constitutional effects over in Maryland? No, Your Honor, and I think you're turning the test on its head. Popularity is not determined by what state legislatures determine. Popularity is determined by what law-abiding citizens choose. Law-abiding citizens choose the firearms that work for them for their lawful purposes. How do we measure that? We measure it with the sorts of surveys that are in the record. Who tells us what's popular? Do the newspapers do it? Where do we find that out? We have in the record extensive surveys, thousands of firearm owners around the country that talk about their preference for these firearms for these lawful purposes. Where do you draw the line? What's the magic number? You know, there isn't a magic number. We had this same colloquy with Chief Judge Trashman and Judge King at the panel, and we talked about a 75,000 too small a number. And it's not clear. I said that would be too small a number. It's not mere numerosity. The Catano case involves stun guns, and the record was that there are only 200,000 of them in the whole country. There's one question I do want to address, and that is to what extent would accessories to a functioning gun be covered by the Second Amendment? I'm speaking to magazines and things of that nature. They must be covered. If they are not covered, then they can be completely banned. Is there any limitation on what accessories would do? If it changes the gun, a regular gun, and has the same characteristics of a machine gun or some other more destructive weapon, is that accessory permissible if it is being used on a gun that is constitutionally forbidden? The accessory itself could be banned if its purpose is to modify a firearm, modify a firearm to make it a banned firearm. In other words, if you are to take... And this issue came up in the Staples case, and it was a great discussion to the court there because in that case, the instrument, the AR-15, had in fact been modified for automatic fire, and the individual was arrested and convicted because he had violated the National Firearms Act. But silencers don't change the firing pattern, and they're illegal by federal statute. That has nothing to do with the firing pattern. What that has to do with is the fact that they're not typically possessed by law-abiding citizens for lawful purposes. The same test that bans the machine gun and the spot-off shotgun. But it's not because they're not armed. Maybe because the ban has gone into effect before they could be popular. I just don't understand how we apply your test. You've given us these loose terms of typicality and popularity and the rest, but those are pretty... The terms you've thrown out were pretty fuzzy, and you say, well, no, you define these by looking at all kinds of studies and surveys and the like. But that's typically what legislators do, is they balance those kinds of things and they weigh that kind of evidence. And we all want to respect Heller, but this seems to me a very significant extension of it, and I don't understand how we ever apply and give any kind of guidance or clarity to the area when the touchstones of the test are typicality and popularity. Could you help me with that? I certainly can. The handgun ban that was struck down in Heller is a much harder case than you had before you today. The handguns, the handguns were involved in more crime, more murders, more mass shootings, more assaults on law enforcement officers than has ever been the case on the firearms that are before you today. As this court was told by the state in the Woolard case in defending its ban, these are the firearms of choice, of criminals. These are the firearms that are the most dangerous firearms. This is an easier case. These firearms are almost never used in crime. These firearms are overwhelmingly kept by law-abiding citizens for lawful purposes. Counsel, I understand that argument because there's a counterargument which doesn't depend purely on numbers, which is, you know, so what if a small percentage of murders are committed with assault weapons, a smaller percentage of murders of handguns are committed with assault weapons? That doesn't answer the question of whether a legislature could conclude that even though a small percentage of murders were committed with these, a much larger percentage of mass shootings were committed with these weapons. And that seems to me the kind of comparison that we should be engaged in. And so that, it seems to me, makes this a vastly different case from Heller when you look at the respective percentages. The respective percentages in Heller are overwhelming for handguns. The state of Maryland told you that handguns are used in 94.7% of the murders. They are the more dangerous firearm, and the one thing we can agree about Heller, the one thing we can agree about what it stands for is the state cannot ban handguns. They are by far the more dangerous firearm than the firearms involved here. This is an easier case. It is truly an easier case. This court has repeatedly talked about, if I may conclude. I need you to wrap up. I'll conclude right now. This court has repeatedly said it would apply strict scrutiny if a restriction burdens the fundamental right of the home. This is not mere dicta, peripheral to a decision. It was a limiting principle relied upon by panel after panel of this court. We're now on banks, if you do understand. I understand. It was a limiting principle, and it applies... Panel decisions, if we... It applies equally today for this reason. The two-part test demonstrates that it is vulnerable to the interjection of a subjective valuation of the degree of burden in determining the level of scrutiny to apply. This allows, consciously or not, the judicial thumb to be placed on the scale. Here we have three other circuits who have looked at exactly these cases. You really need to wrap up. Ten seconds. I'll reserve my time for a moment. Get going. Good morning, ma'am. Please, the court. Mr. Sater, in the great tradition of the Fourth Circuit, I'll ask you a question before you can even get started. Maybe you can, at some point, address the last point that was made, and that is the dangerousness of the handgun versus the dangerousness of the weapon, here. Certainly, Judge Motz. And you can do that at any time, but things get hot and heavy. Get in my question. Thank you, and I will. Let me ask you this. Go ahead. The ultimate answer is that the Supreme Court determined that handguns, regardless of the dangerousness that they exhibit, are the quintessential self-defense weapon, the weapon that is overwhelmingly chosen by Americans for self-defense, and therefore a complete ban on all handguns was taken off the table, and that you couldn't... If it was a weapon that was necessary to self-defense, as chosen by the overwhelming majority of Americans, then its role in crime was something that the legislature wasn't able to address. But that was specifically because of the very unique role that handguns have as being the firearm, as a class, overwhelmingly chosen by Americans for self-defense. If the handgun is, no other firearm can be. There's only one class that can reach that level of being the quintessential self-defense weapon. What laws are limited just to one? The Supreme Court identified that as the quintessential self-defense weapon, and if there is one that is overwhelmingly chosen, then obviously, just by definition, no other can be. What about a hunting rifle or a shotgun? I'm sorry? What about a hunting rifle or a shotgun? Those weapons are used for self-defense. If you want to ban a... If you would enact a complete ban on hunting rifles or ordinary shotguns, they're not assault weapons. They're primarily self-defensive weapons. The Maryland statute doesn't go nearly that far. No, it does not. But if you went that far to shotguns and hunting rifles, that would raise serious Second Amendment problems, wouldn't it? It would certainly raise much, much more difficult problems than this law, and I think you would need to look at whether there was an evidentiary basis to support it. What's the analytical difference between a ban on a shotgun and a ban on rifles, as in Maryland? How does it being a shotgun change your view of the constitutional analysis? Well, based on the evidentiary record and the record that was assembled and that is in the record in this case that was before the General Assembly with respect to the dangerousness of the firearms, especially when it comes to public mass shootings and murders of law enforcement officers. So Maryland found that rifles are more dangerous than shotguns? Maryland found that this subcategory of semi-automatic rifles with particular military features that are the semi-automatic versions of the firearms adopted by militaries around the country are particularly dangerous. They're disproportionately used in mass public shootings. They're disproportionately used in murders of law enforcement officers. The same can certainly not be said of other rifles, and it cannot be said of shotguns. So for those reasons, the legislature determined that they should be banned. You said militaries around the country. Do you mean militaries around the world? I apologize, Your Honor. Militaries around the world. The M16 and the AK-47 are the firearms that, there's regional differentiation, but that have been adopted essentially by militaries around the world for offensive military-style assaults. Could the legislature find that just based on dangerousness, the speed of the projectile, basically the pellets leaving that shotgun have more kinetic energy than you ever need to kill a duck, and therefore we ban them? It's the same question. Based on that dangerousness, could they ban every new weapon immediately so that it can never go into widespread use or ever become close to the quintessential defense weapon? Could they do that? That's not the state's argument, Your Honor. I know that, but that's the question I'm asking you. No, that's not the argument that we propose. I think that is the natural place that the plaintiff's argument leads. It is yours, too. Yours leads there, too. Could you ban? Why couldn't you ban? If you had some record, following up on what Judge Wilkinson said, if the legislature quickly had hearings or whatever they had to do and came up with some legislative record, some justification which you might not accept, maybe you would. We might not accept. But it is one that a reasonable person could accept and ban every new weapon on the day it was introduced, then constitutionally that would stand, wouldn't it? Just banning every new weapon. Based on dangerousness and a quick hearing that they had in Annapolis, could they do that? Well, it depends on. . . It's not just being dangerous. Every arm is dangerous. That's why it's an arm. I got that. That's why I asked you the question. So just based on the fact that it is dangerous, I don't think would just by itself be a right. . . But they have findings. The state of Maryland finds it's dangerous, and this type of weapon, we find, that's what I say, you might accept it, we might accept it, maybe we wouldn't, but they have the legislative findings to say that weapon, the new weapon maybe that Judge Moss is talking about, that weapon is banned in Maryland. Could they not do that under your constitution? It's not popular. It's not in widespread use. Right. So putting that into the hypothetical, what's the answer? I think not being popular is certainly an argument that it could be removed from protection by the Second Amendment at all. That's the plaintiff's argument. So could the legislature do that, remove all new weapons from the Second Amendment protection by banning them before their widespread use? I don't think it could do that for every weapon without regard to whether it really is dangerous. I think your hypothetical that we were discussing with Mr. Sweeney is not outlandish at all because we have the advent of 3-D printing and plastic guns that might be coming in the future for that kind of a weapon where you have the possibility of plastic firearms that aren't detected by metal detectors. You haven't answered my question yet. Why couldn't the legislature do that, ban every new weapon? Under your theory, again, I'm asking your theory, why couldn't they do that? You say dangerousness is not enough. Well, you would say to Maryland, just because it's dangerous, they'd go, we think it's dangerous. We don't think it's really needed in the state. They would have a whole list of findings, and they would do that to ban every new weapon. Under your constitutional view, why couldn't they do that? Because you went to hell on the quintessential handgun. Everything else I'm saying, even new versions, improved to make it slightly different. Why couldn't that be banned under your view? I'm not sure what the rational basis would be for banning every single firearm that would come out regardless of how it compared in dangerousness to firearms that are already on the market. I'm not proposing an absolute test that says that no matter what, every single firearm, regardless of its relative dangerousness, can be banned as soon as it comes out by the legislature. I think the focus is not necessarily on what the legislature might hypothetically do 10 years down the road or when faced with new technologies and everything. Sometimes it's just sufficient under the day, and it's not a question of what necessarily it might do. It's a question of what it did do. And what it did do is classify. And the basic police power under our federal system allows legislatures the ability to draw lines and to classify. Now the question is whether they did this in a non-arbitrary way. And you can look at the pictures of these different weapons that were banned, and it would hit you. Yes, these weapons are not self-defensive weapons used primarily in the home. They are weapons to be used offensively and taken abroad. And the Maryland legislature did not act in a cavalier fashion here. The weapons are included and excluded based on a careful parsing. And if we say the Constitution is basically denying the power of classification, that again just really disables state legislative authority. I think that's absolutely correct, Your Honor, and I think there's been a misunderstanding of the Supreme Court's interpretation or use of the word class with respect to its use in Heller and with respect to the district court's use of it here. The Supreme Court said that you could not ban the entire class of all handguns, not because it was a class. It wasn't the classification that was a problem. It was because that is the class of firearms overwhelmingly chosen by Americans for self-defense. The problem was not the classification. The Supreme Court did not say you can't ban other classes of firearms. It didn't say you can't ban subcategories of firearms that don't have that same connection to self-defense. It didn't say you can't ban a class or subcategory of firearm that is particularly dangerous. It was the role of that class, handguns, as uniquely important to Americans for self-defense, as overwhelmingly selected for self-defense, that was the rationale for the Heller court's decision. I think that is very important because the argument that these firearms, these magazines, are equivalent to handguns for purposes of the Second Amendment analysis is based on a fundamental misunderstanding of the Supreme Court's rationale for overturning the district's ban in Heller. Let me bring you back to the questions that were asked of you just a few minutes ago. It seems like under that theory we're right back to the question of why can't the Maryland General Assembly ban all semiautomatic shotguns? If there's only one quintessential weapon in the semiautomatic shotgun kept by millions of target shooters and hunters and others, can't rise to the level of number one, why can't the Maryland General Assembly ban that? You would then need to go to look at what the state's basis was for that law. That's applying a level of scrutiny, isn't it? That would be applying the level of scrutiny. If it's a firearm that is subject to Second Amendment protection, you need to identify a level of scrutiny and apply that level of scrutiny. When you apply that level of scrutiny, you would need to look at the severity of the burden, and then you would need to say whether the state had produced evidence sufficient to uphold the law as if it's intermediate scrutiny under a reasonable fit analysis. So we don't have that evidence about all semiautomatic shotguns. What we do have in this record is evidence of the particular danger of this subset of a subclass of rifles that is particular semiautomatic rifles with military features that make them more dangerous, that make them disproportionately used in mass public shootings and in murders of law enforcement. You know, there's another feature of this debate because when we ask, well, could the General Assembly enact this total ban on this and could a legislature enact this total ban on this, what disappoints me is the complete loss of faith in democracy and our basic democratic processes. You know, the actors in this struggle are not puny. They are not powerless. Those who believe, and they have a very legitimate argument, that guns are going to be useful in deterring crime and promoting self-defense, that's a legitimate argument. And there are other people that believe that regulating firearms to a certain extent is the way to go. And that's a hard, hard question. But the point is neither side in this political debate is bereft of the most robust conceivable representation. If there ever was a political struggle where the actors are muscular and to a considerable extent in the political argument in this country, pretty evenly matched, it would argue for letting democracy have some leeway because historically courts have intervened under Caroline products, footnotes, and other things where people couldn't take care of themselves in the political process. But gun owners, they can press their legitimate, they are legitimate arguments in the political process. They're not at a loss for public support or active lobbying or whatever. But I just don't understand this lack of faith in basic democratic processes that leads us to believe that all this has to be taken from popular participation and put in our courts. And that's why, Your Honor, under the intermediate scrutiny test, it's the role of the court to reduce the failure. You don't believe that the application of a strict scrutiny test on the First Amendment is an attack on democracy, do you? The application of a strict scrutiny test? Yeah, you don't think the application of a strict scrutiny standard on certain constitutional rights. Do you stand there and tell us that's an attack on democracy? I'm not telling you that, Your Honor. I'm talking about the law that is before this court where the Maryland legislature But my question was the use of the court using a strict scrutiny standard over a right recognized in the Constitution. Now, we can argue about what that right is, but you don't think the choice of a strict scrutiny standard to judge a legislative body or a state's action, you don't think that's an attack on democracy, do you? I wouldn't use the phrase attack on democracy to the extent that the courts How about lack of faith in the General Assembly? If the General Assembly of a state passes some regulation that people who want to demonstrate, say, for Trump or for Black Lives Matter, they can't do it on the statehouse grounds. And the General Assembly votes for it, the governor signs, and then a court looks at it and applies strict scrutiny to it. The application of strict scrutiny in that context is no disallowance of the rights of individuals to act. Don't we just recognize limits on that? The Supreme Court has certainly identified strict scrutiny as appropriate for the review of certain measures that have a severe impact on a protected right under the Constitution. Do you agree that the Maryland law limits the right of a law-abiding citizen to keep a firearm in his home for protection of his hearth and home? No. You don't think it limits the ability to have a firearm to do that? To have a firearm? No, it does not, Your Honor. What this law addresses is a certain subset of particular firearms, and the Second Amendment right identified by the Supreme Court in Heller was not a right to choose a particular firearm to use for self-defense. I thought Heller said specifically that it's no answer to that question to say that there are other classes of firearms that can be used for self-defense. Only in the particular context of the handgun because of the unique role the handgun plays as the quintessential self-defense weapon. That statement wasn't limited, was it? I get that it was about handguns. It could not be limited because they came and overruled the ban on stun guns. That wasn't quintessential. That's not a handgun. In Massachusetts, they banned stun guns, which the court noted represented about 200,000 copies in the United States, and the Supreme Court unanimously overruled that. That's actually not the case, Your Honor. The Supreme Court sent that back after correcting a couple of flaws in the logic of the Supreme Judicial Court of Massachusetts. They did not overrule on the substance of it. They said when the Supreme Judicial Court of Massachusetts said stun guns aren't protected because they didn't exist in 1791, that that was an insupportable basis for upholding the law. They would have sent it back if they thought that stun guns did not represent what you argue is the quintessential handgun that's protected by the Second Amendment. I don't read Heller and the subsequent cases at all limiting this to handguns. I think they talk about long guns, rifles, and you're trying to make a distinction between a hunting rifle and a long gun and the AR-15. I haven't heard you make the real distinction that would justify one and not the other. It seems to me if you believe that AR-15s and the protection of the home are properly banned, then you should have to argue also that a modern hunting rifle with all its gear and scopes and high-powered barrels and so forth is also subject to being banned. But that's not at all the evidence, Your Honor. That's not at all the evidence that was before the legislature. That's not at all the evidence that's in this record. In fact, the evidence is directly to the contrary, that the modern hunting rifle is not used disproportionately in mass public shootings or murders of law enforcement officers, that the shotgun is not either. It doesn't go anywhere because the handgun is used in mass shootings. It's used in most shootings in Maryland. And so to make that argument doesn't advance your argument at all. You have to be understanding where the Supreme Court was coming in Heller and not be applying some kind of formula about a quintessential classification. The court was basically saying that people have a right to arm themselves and protect themselves in the home and heart, and that's the core right that's being protected. Now you're saying the citizens of Maryland can buy hunting rifles, high-powered hunting rifles and shotguns, but they can't buy an AR-17 for that purpose. And I agree with that statement of what the right was, but the rationale that the Supreme Court used wasn't you can't ban any firearm that could conceivably be used for self-defense. It was a comparison between an AR-15 and a hunting rifle. And the comparison is that the evidence shows that the— The case is a little different. And one is used to dramatically disproportionate effect, and not only are they used disproportionately in mass public shootings and murders of law enforcement officers, but when they are used, they function as they were intended, which means more shots get fired, more people get injured, and more people die. So the point I make is if that is the criterion for banning a weapon, then you have to be able to ban handguns because they are disproportionately the weapon of choice for murderers, and that's what the data show. And so the question is, it seems to me, if you're going to remain consistent, there's got to be some principled way by which you distinguish an AR-15 from a hunting rifle or a handgun, which is used in murders regularly, much higher in number than the AR-15. The principled way of distinguishing the AR-15 from the hunting rifle, Your Honor, is what I've said. As far as the reasonable fit analysis, the evidence of their dangerousness is clear in the record, and they are disproportionately used. As far as the difference between the AR-15 and the handgun with respect to the dangers posed by handguns, the rationale that the Supreme Court used as for why handguns cannot be banned is because they, unlike any other class, unlike any other subcategory of firearms, are overwhelmingly chosen for self-defense and are the quintessential self-defense weapon. That status does not apply to the AR-15 or to these other firearms that were designed for military offensive assault purposes that are disproportionately used in these types of incidents that involve particular danger, that when they are used, more people get shot, more people get killed than when they are not used. Mr. Stater, listening to this empirical discussion and everything, and this is what at times is a policy debate, you will forgive me if at times this morning I felt like I was in a state legislative chamber, even though last time I checked I wasn't elected to anything. I tried to get elected. It just didn't work. But when we talk about disenfranchising people, that's a very serious step. And the times when courts have stepped in most frequently with strict scrutiny has been to protect members of minority religious faiths or people who were expressing under the First Amendment very unpopular views or minorities who were the subject of discrimination and they really didn't have protection from political process. Civil rights cases so often involve people who can't make their way in the political process. In our First Amendment cases and our freedom of religious exercise cases, there's quite a small minority of people whom the majority disparages, often for really illicit reasons. And this is a totally different thing because nobody's powerless here. It doesn't present the classic case for disenfranchisement or strict scrutiny, which the history of constitutional law does. It's a totally different ground for invoking this heightened standard. And, in fact, the court's role is to review whether the legislature, in weighing the evidence that was before it, whether there's substantial evidence to support it, not to re-weigh the evidence and determine what the court would do. But that's still scrutiny. That's still applying some level of scrutiny. When we go, we start examining reasons why a legislature does something. That's true, Your Honor. Go ahead. And panel decisions by this court, as well as decisions of the vast majority of other courts that have looked at this, have applied a two-pronged test for Second Amendment challenges. Excuse me. I understood you to say earlier, to say that the Second Amendment wasn't implicated by this law, that it didn't affect the rights of a law-abiding citizen to use a firearm in defense of his home. Now, so can you clear that up for me? Are you saying the Second Amendment is not implicated or it is implicated by this law? And I think that's a slightly different question. I was operating – this discussion about applying a standard of scrutiny is based on the assumption that there is conduct burdened by the Second Amendment. Okay, but what's your position as to whether or not there's any burden at all? My position is that because these are dangerous and unusual firearms that would fit that category as historically understood, they would not fall within the protection of the Second Amendment. There would be no level of scrutiny involved in your analysis because the Second Amendment is just not implicated. In this case. In this case for these particular firearms based on their characteristics. Because they're like – sufficiently like the M16 mentioned specifically in Heller. That's correct, Your Honor. How do you deal, though, with Mr. Sweeney's proposition that the line to be drawn, pursuant to Heller, is between automatic weapons and semi-automatic weapons like the AR-15? A civilian version. That's the difference, he says, semi-automatic and automatic. That's the line drawn by Heller. There is no such line drawn in Heller, nor is there such a line drawn in Staples. Staples involved the comment – it was a positive statement about the law as it existed at that point, not a normative statement about what could or could not be banned. Staples simply said, historically, and Staples was decided in 1994, just before the imposition of the federal ban on assault weapons. Staples said, historically, if it wasn't a machine gun or a sawed-off shotgun, you could have one. So when this individual had a firearm he believed to be a semi-automatic, not an automatic weapon, he didn't have reason to believe that it was banned, which as a positive statement of the law at that point was accurate. But that doesn't have anything to do with the court saying you cannot even think about banning a particular subcategory of semi-automatic weapons. And, in fact, there is no such distinction drawn in Heller or Staples or anywhere else as far as saying what can or cannot be banned. Now, all the other circuits that have addressed this general question, with the exception, I think, of the Seventh Circuit, which went off and did its own thing, have either assumed or found that there was a Second Amendment burden and then moved on to the level of scrutiny. If we assume that we're in accord with the other circuits in that regard, I haven't heard you articulate why intermediate scrutiny applies as opposed to strict scrutiny. You seem to have just assumed it. Well, the reason intermediate scrutiny applies is because, as those other courts have found and as panels of this court have found in looking at, by analogy, First Amendment to determine what level of scrutiny applies, you look at the nature of the burden of the law and you look at the severity of the burden of the law. And here, I think the most important factor is the severity of the burden. And in looking at that, the discussion has to be guided by the right that the Supreme Court identified in Heller, which is the right of law-abiding individuals to bear arms, centered on self-defense, primarily in the home. And the question is, is there a severe burden from this law on that right? If not, it's necessarily subject to intermediate scrutiny. And the record in this case and the record as found by all of those other courts is that there is not a severe burden on the right identified by the Supreme Court because these firearms are rarely, if ever, used in self-defense. These magazines, there is rarely, if ever, a need to fire more than ten rounds at a time in self-defense. Do you think that there is a possibility under Heller, you don't think it would apply in this case, but there is a possibility of the use of the strict scrutiny standard in a Second Amendment case? Yes, the Supreme Court did not rule out the possibility, but I think that based on what courts fairly universally have found with the acceptance of the Seventh Circuit is that you need to look at the severity of the burden in determining what standard of scrutiny should apply. Can you give me an example of a firearm restriction that would require strict scrutiny besides the one in Heller? Well, I would think that anything, so Heller banned all handguns. I would think that a law that banned a sufficient subcategory of handguns that most handguns became effectively unavailable for self-defense might be subject to a similar kind of analysis, a strict scrutiny analysis. Heller has already decided that. There is no restriction on Heller's finding that handguns could be lawfully possessed. But the Supreme Court decided that the district's law was unconstitutional because it banned the entire class of handguns. I don't think the Supreme Court at all suggested that you couldn't have a ban on some subclass of handguns that might be particularly dangerous when compared to others. So if a legislature decided, well, these particular handguns we believe are different, more dangerous than other handguns, strict scrutiny would apply to that? Not necessarily. If it's a subset that doesn't ultimately impose a severe burden on the Second Amendment right overall to self-defense, then it wouldn't be subject to strict scrutiny. Can you give me an example? Just to make sure we're talking about the same thing. Can you give me a concrete example? So if they were to ban all semi-automatic handguns and revolvers, but leave certain single-shot pistols out there as the only handgun that would be permissible, you could certainly make the argument that that would be subject to a much higher level of scrutiny than intermediate. Where they start to differentiate between types of handguns. And ban the vast majority of them while leaving some with much lesser capabilities. But isn't that what Maryland did with regard to the rifles? Not at all, Your Honor. Maryland's ban is much narrower than the equivalent of that. On a follow-up on that, is Maryland's law the most restrictive in the country? No, Your Honor. The New York and Connecticut bans are certainly more restrictive than Maryland's. I don't know the particulars of others, but Maryland's is not. Does Maryland's law restrict semi-automatic pistols? Maryland has a provision in its law that has been in existence since 1994 and is not challenged here today banning assault pistols, where there are a certain subcategory of pistols that are banned. Does it use the word semi-automatic? How do you classify the handguns that are banned? By name. That's not challenged here. That is not challenged here. No, I understand, but it's a ban of a handgun as part of this statute, which is banning everything that's semi-automatic, right? No, the statute does not ban everything that's semi-automatic. It does not ban all semi-automatic rifles. It does not ban all semi-automatic shotguns. It bans a particular set of them that have particular military features that the General Assembly found to make them particularly dangerous. There are semi-automatic rifles and shotguns that can be owned in the state of Maryland. If Maryland required to put out an edict that says that we'd like all citizens of Maryland to voluntarily turn their handguns in as a sign of, you know, kumbaya, peace, love, and a significant amount of people in Maryland did that. As a matter of fact, in terms of the population of the state, compared to the number that turned in, it could be somewhere like 90% did. Then could Maryland ban handguns? Because I assume that the line of thinking there would be that they're not commonly possessed and, therefore, they don't meet the test in the first part, the first prong of the analysis. Right. I don't know. I confess to being confused for all the reasons that were discussed. You seem to be clear about everything else. But in a sense, isn't that the whole problem? Because we know you didn't take any issue with 94% of the murders in Maryland were by handguns, the dangerousness of it. And you seem to concede that handguns were, by popularity, the primary weapon of defense choice, choice for defense. So now in Maryland, people have decided to disengage themselves of that popular defense. So, therefore, then no strict scrutiny at all. Well, the question would then become what the test is for common use and for typically possessed. Common use, we don't. They don't have them. They're gone. And the state legislatures, I suppose in terms of federalism and democracy, don't they have a right now to say we don't need that because people in Maryland don't use handguns anymore? I don't think that it's ever been decided whether it's a national test as far as a local test. And that's one of the real problems with, I think, a phrase that was used in Heller that courts have. So since we don't know, aren't we left then with an enumerated right under the Constitution, as Heller clearly says, is that the right is to protect. The core of it is self-defense, correct? That is the core of the right, yes. Right, that's the only thing we know that's core. So whatever might happen in the atmosphere of the future in terms of the difference in the balances, isn't that the core to test whether or not any statute would offend that enumerated constitutional right? And why wouldn't you apply strict scrutiny to that? You have enumerated First Amendment rights normally. Well, you don't in the First Amendment context just because something might happen to have an effect on the First Amendment right. The question is, what is the level of the burden? Is it a severe burden? And identifying a particular subset of a subclass of firearms that aren't available while leaving 97% of all the firearm stock available, including the firearms overwhelmingly chosen by Americans for self-defense, does not burden that self-defense right. It's certainly not an appreciable burden that would call for the application of strict scrutiny. It's amazing to me. That's just the opposite. We know that we're killing each other with handguns. That's an incredible truth. With handguns, we're killing each other with them. And that is not enough at all to prevent the Constitution's enumerated right. Heller made that very clear, painstakingly, historically. All those other cases you were wrong when you were looking at collective rights and militias. It was all about individual right to self-protection in spite of its dangerousness. But it did that based on the particular status of the handgun, which it identified as the class of the entire class of handguns, as an entirety, is overwhelmingly chosen by Americans for self-defense. That was the reason why a complete ban on all handguns could not succeed. It was the status of the handgun in particular that was the core of what the Supreme Court decided in that case. It did not apply generically to every arm that could possibly be used for self-defense. It was based on the particular characteristics and standing of the handgun with respect to self-defense. That does not apply to these firearms, and the district court's judgment should be affirmed. Thank you, Mr. Tate. Mr. Tweeney, you have some time remaining. I appreciate the court's indulgence in that regard, considering how much time I took the first time around. First off, it is no answer to say, as the Heller court did, that it is permissible to ban handguns so long as possession of other firearms is allowed. There were two bans in the Heller case, a ban on all operable firearms in the home and a ban on any handguns. The district said stop only with overturning the ban on operable firearms. The availability of long guns in the home for defense is enough. The Heller court said that's not enough. Both bans must go. It is no answer to say that it's permissible to ban the handguns so long as long guns are available, and that's what the state's saying here. It's not just the plaintiffs who are saying this burden is substantial. The Second Circuit in the case in the New York State Rifle and Pistol Association case cited by the state said these laws are broad and burdensome, an absolute prohibition, a serious encroachment, not mere incidental restraints, and a substantial burden. I want to just ask you something about we're talking about use in the home, and yet a weapon is by definition mobile. It's not what we always recognized in real property as being a fixture like a toilet seat or something that was nailed down in the home. And weapons can move in and out of the home, but why couldn't the legislature say, yeah, every weapon is stored in the home. Every weapon spends part of its useful life in the home one way or another. But weapons being as mobile as they are, why couldn't the legislature conclude these weapons are especially or at least disproportionately likely to be taken out on the town. And if they don't imbue their possessor with a commando spirit, they seem designed and manufactured to be uniquely useful in inflicting mass carnage. And that's why militaries across the world have picked up on them. Why couldn't the legislature come to that conclusion? This court has already affirmed the Maryland legislature's regulation of handguns in that regard for carry outside the home. Ironically, the state of Maryland does not limit the carry of these banned firearms outside the home. The hundreds of thousands of them now in the hands of mail can be carried outside. I'd like to address burden for a moment. The state agrees that if the burden is severe, strict scrutiny would apply. And I think we'd all agree if there was no burden at all, rational basis would be the test. We know that if there is some burden, however slight, that intermediate scrutiny must be applied. So what do you do with a burden that is substantial? The Second Circuit said intermediate scrutiny. The panel determined whether it's substantial or not. Well, one of the things the Hella Court said is you can't use the availability of other firearms in making that determination. That's what turns the two-part test into a freestanding interest balancing test, a subjective determination that it's not a burden that's worthy of strict scrutiny because other firearms are available, a consideration specifically forbidden in the Heller case. That consideration comes in, if at all, only in considering tailoring after the level of scrutiny is selected. And strict scrutiny does not take away from the legislature. Strict scrutiny simply ensures that the legislature narrowly tailors a law where it is encroaching upon a fundamental individual right. The state has no limiting principle here. Its rationale could apply to any protected firearm, allow it to draw the line anywhere. The Bill of Rights exists precisely to preserve fundamental individual freedoms in the face of democratic rule. And this court cannot possibly defer. But the point is, Counselor, the Bill of Rights has never been thought to be absolute. You have the word reasonable in the Fourth Amendment, which implies a balance. And even with our revered First Amendment, if it has an impact, it's still a question of balancing burden versus benefit, the strength of the state's interest versus the severity of the benefit. But you have talked this morning as if this right was almost absolute. And to hold that it's almost virtually entitled to absolute status is a significant extension and expansion above what I thought Heller represented. Because Heller is actually a fairly cautious opinion. And it specifically preserves certain areas where the state can regulate firearms. But this right that you're talking about, I don't deny that it exists, but it's not absolute any more than a First Amendment or a Fourth Amendment right is absolute. At some point, individual interests have to come in their intention and they have to be harmonized with public safety and public interests. They don't exist in a vacuum. They exist in the context of society and its claims for its members to be safe from the kind of attacks that are being visited upon them. That's all I'm saying. This is an extension of Heller, isn't it not, sir? And what Heller said was that the Second Amendment elevates above all other interests the rights of my plaintiffs to arm themselves in their homes. This is an in-the-home governmental intrusion. And successive panels of this court have said they would apply strict scrutiny if a restriction burdens the core right. That day has come. And I would trust that you would do that. Thank you very much for hearing our appeal. I appreciate the arguments of both you and Mr. Slater. I'll ask the clerk to adjourn the court and then we'll come down and recount. This honorable court will take a brief recess.
judges: Traxler, Wilkinson, Niemeyer, Motz, King, Gregory, Shedd, Agee, Keenan, Wynn, Diaz, Floyd, Thacker